B 104 [08/07]

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Official Committee of Unsecured Creditors of Imperial Capital Bancorp, Inc.

**DEFENDANTS**
Norval L. Bruce, Timothy M. Doyle, George W. Haligowski, Phillip E. Lombardi, Lyle C. Lodwick, Jeffrey L. Lipscomb, Sandor X. Mayuga, Hirotaka Oribe, Robert R. Reed, Scott Wallace, and Does 1-10

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 229-1000

**ATTORNEYS** (If Known)
Latham & Watkins
355 South Grand Avenue
Los Angeles, CA 90071-1560
(213) 891-8778

**PARTY** (Check One Box Only)
- [ ] Debtor
- [x] Creditor
- [ ] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Other

**PARTY** (Check One Box Only)
- [ ] Debtor
- [ ] Creditor
- [ ] Trustee
- [ ] U.S. Trustee/Bankruptcy Admin
- [ ] Other

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

The Adversary Complaint seeks compensatory and punitive damages on behalf of the bankruptcy estate of Imperial Capital Bancorp, Inc. ("Imperial") for damages that Imperial and its stakeholders, including its creditors, suffered as a result of the Defendants' breaches of fiduciary duties, including breaches of the duties of loyalty and good faith resulting from the Defendants' self-interested management of Imperial.

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [ ] 11 - Recovery of money/property - § 542 turnover of property
- [ ] 12 - Recovery of money/property - § 547 preference
- [ ] 13 - Recovery of money/property - § 548 fraudulent transfer
- [ ] 14 - Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21 - Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31 - Approval of sale of property of estate and of co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [ ] 41 - Objection / revocation of discharge - § 727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51 - Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims
- [ ] 62 - Dischargeability - § 523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61 - Dischargeability - § 523(a)(5), domestic support
- [ ] 68 - Dischargeability - § 523(a)(6), willful and malicious injury
- [ ] 63 - Dischargeability - § 523(a)(8), student loan
- [ ] 64 - Dischargeability - § 523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65 - Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71 - Injunctive relief - reinstatement of stay
- [ ] 72 - Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81 - Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [ ] 91 - Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01 - Determination of removed claim or cause

**Other**
- [ ] SS-SIPA Case – 15 U.S.C. §§ 78aaa *et.seq.*
- [x] 02 - Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

- [x] Check if this case involves a substantive issue of state law
- [ ] Check if this is asserted to be a class action under FRCP 23
- [x] Check if a jury trial is demanded in complaint
- Demand $ In excess of $25 million

Other Relief Sought
Punitive damages, attorneys' fees, costs and expenses, and any other relief deemed appropriate by the Court.

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>Imperial Capital Bancorp, Inc. | | BANKRUPTCY CASE NO.<br><br>09-19431-LA11 |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Southern District of California | DIVISIONAL OFFICE | NAME OF JUDGE<br><br>Hon. Louise DeCarl Adler |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ David P. Simonds | | |
| DATE<br><br>07/15/2011 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>David P. Simonds | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
DAVID P. SIMONDS (SBN 214499)
CHRISTINA M. PADIEN (SBN 235062)
HYONGSOON KIM (SBN 257019)
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone:     (310) 229-1000
Facsimile:      (310) 229-1001
Email:          dsimonds@akingump.com
                cpadien@akingump.com
                kimh@akingump.com

Attorneys for THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF IMPERIAL CAPITAL BANCORP, INC.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>IMPERIAL CAPITAL BANCORP, INC., a Delaware corporation,<br><br>Debtor.<br><br>Fed. Tax Id. No. 95-4596322 | Chapter 11 Case<br><br>Case No. 09-19431-LA11 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF IMPERIAL CAPITAL BANCORP, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>NORVAL L. BRUCE, TIMOTHY M. DOYLE, GEORGE W. HALIGOWSKI, PHILLIP E. LOMBARDI, LYLE C. LODWICK, JEFFREY L. LIPSCOMB, SANDOR X. MAYUGA, HIROTAKA ORIBE, ROBERT R. REED, SCOTT WALLACE, and DOES 1-10,<br><br>Defendants. | Adv. Pro. No. _____<br><br><br>**COMPLAINT FOR BREACH OF FIDUCIARY DUTY**<br><br>**(Jury Trial Demanded)** |

## ADVERSARY PROCEEDING COMPLAINT

The Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff") of Imperial Capital Bancorp, Inc. ("Imperial" or "Debtor"), on behalf and as the representative of the Debtor's bankruptcy estate, by and through its undersigned counsel, hereby alleges as follows for its complaint against the above-captioned defendants (the "Defendants"), based upon information and belief and as a result of its investigation to date:

## NATURE OF THE ACTION

1.    This action by the Committee seeks damages for breaches of fiduciary duties, including the duties of loyalty, care, good faith and oversight, owed to the Debtor and its stakeholders, including its creditors, in connection with Defendants' approval and implementation of a reckless gambit by Defendants to enrich themselves and imperil Imperial's financial condition through a course of conduct involving, among other things, the purchase of mortgage-backed securities called Collateral Mortgage Obligations ("CMOs"). Upon information and belief, Defendants implemented this strategy to increase the value of their personal investments in Imperial, and knowingly or recklessly placed Imperial's fiscal health, credit and risk profiles, and liquidity directly at risk.

2.    Between 2005 and 2008, at Defendants' direction, Imperial caused its wholly-owned subsidiary, Imperial Capital Bank (the "Bank"), to originate ever-increasing amounts of real estate loans, even in the midst of a rapidly burgeoning credit crisis, rising interest rates and plummeting real estate values. Upon information and belief, Defendants were aware of, but ignored, what the Federal Deposit Insurance Corporation's ("FDIC") examiners described as an absence of effective internal controls at the Bank over the loan administration, origination, analysis and grading process.

3.      In 2008, when the opportunity to originate real estate loans dried up, Imperial did not reduce its exposure to the real estate markets.  Instead, in March 2008, in their capacity as directors and officers of Imperial, Defendants doubled-down on the housing market by approving the purchase of over $800 million in CMOs.  These securities were backed by loans issued by institutions such as IndyMac Bank ("IndyMac"), Countrywide Bank ("Countrywide"), and Washington Mutual Bank ("WaMu") – banks that by March 2008 were on the brink of receivership and bankruptcy themselves, as Defendants knew.  The loans backing the CMOs issued by these banks were known to be undercollateralized and severely lacking in documentary support.  Defendants knew that any downgrade in the CMOs' credit rating would have a devastating impact on the CMOs' value, as well as Imperial's and the Bank's ability to borrow funds.  The purchase of these securities also came at the expense of liquidity, as Imperial and the Bank were forced to rely on higher-interest secondary borrowing sources, increasing their cost of funds and further straining their credit.

4.      Defendants either consciously disregarded these facts or were willfully blind to them.  Instead, Defendants focused on just one thing: the resulting interest income, which would cause an illusory earnings boost that, when publicized, would inflate Imperial's stock price.  Imperial always acknowledged that its earnings depend almost entirely on interest income, and Defendants were well aware that $800 million of CMOs would boost those earnings in the short-term, but at a tremendous short-term and long-term cost to Imperial.

5.      Defendants waited more than three months to release information to the public concerning the size and scope of the CMO acquisition.  In the meantime, many of the Defendants increased their positions in Imperial stock – several Defendants making their first such purchases in many months.  When Defendants finally publicly disclosed this information, Defendants

omitted almost all material negative information about the CMO acquisition, including the poor quality of the underlying loan pool and the attendant risks to Imperial's credit and liquidity.  As a result of the distorted view presented by Defendants to the public, Imperial's stock price rose steadily for almost two months following the mid-July 2008 announcement of the CMO purchases.

6.    But, by the end of 2008, almost all of the CMOs had been downgraded to sub-investment grade.  The many obvious risks inherent in the acquisition of CMOs, of which Defendants were aware but which Defendants disregarded, became reality.  The Bank was no longer able to maintain regulatory capital ratios.  Nor could it or Imperial borrow the funds necessary to survive.  Imperial could not escape the resulting downward spiral, ultimately leading to Imperial's bankruptcy filing in December of 2009.

7.    During a critical period for Imperial, when well-informed and unbiased action was needed, Defendants consciously disregarded known risks and chose to increase Imperial's stake in the clearly declining real estate market for the short-term earnings boost.  Worse, upon information and belief, Defendants timed the release of information regarding the CMO investment to maximize Defendants' opportunities to line their own pockets.  In doing so, Defendants breached their fiduciary duties to Imperial and its stakeholders, including Imperial's creditors, for which they should be held to account.

8.    In addition to the foregoing, when Imperial's then-Chief Executive Officer suddenly took medical leave in February of 2009, Defendants chose not to retain an interim Chief Executive Officer with sufficient experience to guide Imperial through the serious crises caused by their own prior actions.  Instead, Defendants allowed members of Imperial's Board of Directors – neither of whom possessed any experience as chief executive officer of a financial

4

institution such as Imperial, much less experience sufficient to guide Imperial's response to extreme economic, credit and regulatory demands – to fulfill the duties of Chief Executive Officer. It was not until October of 2009, eight months later and only two months before Imperial filed for bankruptcy, that Defendants finally retained a new Chief Executive Officer. By then it was far too late. This represented an additional and significant breach of the Defendants' fiduciary duties to Imperial.

9. The Defendants in this action include every member of the current Board of Directors of Imperial. As a result of the allegations herein concerning Defendants' conduct, each of the current members of the Board of Directors of Imperial faces a substantial likelihood of liability and is therefore unable to properly and impartially consider a demand on the Board of Directors to investigate and bring the claims alleged herein.[1]

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b) and 1334(b). This adversary proceeding relates to the above-captioned Chapter 11 case pending before this Court. Pursuant to 28 U.S.C. § 1409(a), venue properly lies in this District, where the Debtor's chapter 11 case is pending.

11. This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in the event that any part of this adversary proceeding is found to be "non-core," the Committee consents to entry of final orders or judgment by this Court.

---

[1] Concurrently with the filing of this Complaint, Plaintiff has filed a motion seeking permission to investigate and bring certain claims in lieu of the Debtor and on behalf of the Debtor's bankruptcy estate.

# THE PARTIES

## Plaintiff

12.     Plaintiff is the committee of unsecured creditors appointed on March 9, 2010, pursuant to section 1102 of the Bankruptcy Code, in the Debtor's chapter 11 case.  The Committee is composed of the following entities: U.S. Bank National Association, as Trustee for ITLA Capital Statutory Trust I, ITLA Capital Statutory Trust II and ITLA Capital Statutory Trust V; 888 Prospect LJ, LLC; and The Bank of New York Mellon (f/k/a The Bank of New York), as Trustee for ITLA Capital Statutory Trust III and ITLA Capital Statutory Trust IV. Plaintiff brings this action derivatively on behalf of, and for the benefit of, the Debtor's estate.

## Inside Director Defendants

13.     The "Inside Director Defendants" are comprised of Norval L. Bruce and George W. Haligowski.  Unless otherwise specified, the actions taken by the Inside Director Defendants as alleged in this Complaint were taken in their capacities as executive officers of Imperial.  All information contained in paragraphs 14 and 15 are stated upon information and belief.

14.     Defendant Norval L. Bruce ("Bruce") was an executive officer of Imperial until December 31, 2008, serving as Chief Credit Officer of Imperial from June 1999 through August 2007.  Bruce remained as an executive officer until December 31, 2008 to assist in the transition of his duties as Chief Credit Officer to Defendant Phillip E. Lombardi.  Bruce also has served (and continues to serve) as a Director of Imperial since September 1997 and has been the Vice Chairman of the Board of Directors of Imperial since June 1999.  Bruce resides in Orange County, California.

15.     Defendant George W. Haligowski ("Haligowski ") was Imperial's President from 2000 to October 31, 2009 and its Chief Executive Officer from July 1992 to October 31, 2009.

He also was Executive Chairman of the Board of Directors of Imperial from 1996 to October 31, 2009, and has served as a Director of Imperial from 1996 to the present.  Haligowski resides in San Diego, California.

**Outside Director Defendants**

16.     The "Outside Director Defendants" are comprised of Jeffrey L. Lipscomb, Sandor X. Mayuga, Hirotaka Oribe, and Robert R. Reed.  All information contained in paragraphs 17 through 20 and 24 through 27 are stated upon information and belief.

17.     Defendant Jeffrey L. Lipscomb ("Lipscomb") was a Director of Imperial from 1996 until February 17, 2010.  Lipscomb resides in San Diego, California.

18.     Defendant Sandor X. Mayuga ("Mayuga") has been a Director of Imperial from 1996 to the present.  Mayuga resides in Long Beach, California.

19.     Defendant Hirotaka Oribe ("Oribe") has been a Director of Imperial from 1996 to the present.  During all relevant times, Oribe resided in Palos Verdes, California.

20.     Defendant Robert R. Reed ("Reed") has been a Director of Imperial from 1996 to the present.  Reed resides in Albuquerque, New Mexico.

21.     The Outside Director Defendants and the Inside Director Defendants are referred to collectively as the "Director Defendants."

22.     In their capacity as directors of Imperial, the Director Defendants had direct responsibility for managing the corporate affairs of Imperial, and had direct responsibility for approving all material financial, transactional and/or strategic decisions of Imperial.  Upon information and belief, to the extent that financial, transactional or strategic decisions of the Bank materially impacted Imperial, the Director Defendants, in their capacity as directors of Imperial, also had direct responsibility for approving all such decisions of the Bank and for managing the affairs of the Bank.

7

**Officer Defendants**

23.     The "Officer Defendants" are comprised of Timothy M. Doyle, Phillip E. Lombardi, Lyle C. Lodwick, and Scott Wallace.

24.     Defendant Timothy M. Doyle ("Doyle") was Senior Managing Director and Chief Financial Officer of Imperial from May 2000 to August 2005 and was Executive Managing Director and Chief Financial Officer of Imperial from August 2005 through December 15, 2009. Doyle resides in San Diego, California.

25.     Defendant Phillip E. Lombardi ("Lombardi") was Executive Managing Director and Chief Credit Officer of Imperial from May 2004 until November 30, 2009.  Lombardi resides in Los Angeles, California.

26.     Defendant Lyle C. Lodwick ("Lodwick") was the Executive Managing Director and Chief Operating Officer of Imperial from August 2005 to July 31, 2009.  Lodwick resides in San Diego, California.

27.     Defendant Scott Wallace ("Wallace") was Treasurer and the Managing Director of Finance of Imperial from May 2004 to December 2009.  Wallace resides in San Diego, California.

28.     In their capacity as officers of Imperial, the Officer Defendants and the Inside Director Defendants had direct responsibility for overseeing the day-to-day corporate affairs of Imperial, and had direct responsibility for investigating, proposing and overseeing the execution of all material financial, transactional and/or strategic decisions of Imperial.  Upon information and belief, to the extent that the operations of the Bank, the Officer Defendants and the Inside Director Defendants, in their capacity as officers of Imperial, also had direct responsibility for overseeing the day-to-day affairs of the Bank.  Upon information and belief, to the extent that financial, transactional or strategic decisions of the Bank materially impacted Imperial, the

Officer Defendants and the Inside Director Defendants, in their capacity as officers of Imperial, had direct responsibility for investigating, proposing and overseeing the execution of all material financial, transactional and/or strategic decisions of the Bank.

29.    By virtue of his position as either an executive officer or director of Imperial and resulting access to non-public information concerning Imperial's financial condition, business plans, and strategy, each Defendant was at all relevant times a corporate insider of Imperial.

30.    All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable to this action by Bankruptcy Rule 7020, because the right to relief asserted against all Defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and questions of law and fact common to all Defendants or certain categories or classes of Defendants are implicated in this action.

**Doe Defendants**

31.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sues these defendants by such fictitious names and capacities.

32.    Plaintiff will amend this complaint to allege the true names and capacities of Does 1-10 when ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that the damages to Imperial herein alleged were proximately caused by the conduct of such Defendants.

33.    Haligowski, Doyle and Does 1-10 are collectively referred to as the "CMO Investigation Defendants."

**BACKGROUND INFORMATION CONCERNING COLLATERAL MORTGAGE OBLIGATIONS AND ALT-A LOANS**

34.     As alleged herein, Defendants' actions included causing Imperial to direct the Bank to purchase non-agency CMOs backed by "Alt-A" loans. The financial concepts and constructs most critical to an understanding of Defendants' actions are summarized below.

**CMOs**

35.     CMOs are bonds issued by a special purpose entity that owns a pool of mortgages. Holders of the bonds are entitled to the cash flows from the mortgage pool, and split risk of non-payment depending on the tranch to which they belong. "Non-agency" CMOs are CMOs backed by loans not insured by Fannie Mae or Freddie Mac; hence, holders of such bonds absorb the dual risk of fluctuating interest rates and default or delinquencies by borrowers in the loan pool.

36.     The value of CMOs, like most mortgage-backed securities, is dependent upon the credit rating given to the CMO. The credit rating assigned to a CMO represents the risk that the issuer will default or not be able to meet its obligations. Given the exceedingly complex nature of securities such as CMOs, markets rely heavily upon credit rating to determine the worth of a security. A slight downgrade in the credit rating of a CMO can result in a substantial decrease in the security's market value.

**Alt-A Loans**

37.     The CMOs at issue in this action were backed by what are known as "Alt-A" loans. According to the FDIC, an Alt-A loan is "a mortgage made to a borrower that typically does not involve verification or documentation of income, assets, or employment. Instead, the approval of the loan is based primarily on the applicant's Fair Isaac Corporation (FICO) credit score."

10

38.     During the height of the housing market in 2003-2005, lenders gravitated towards Alt-A loans because borrowers for Alt-A loans ostensibly had better credit than subprime borrowers, but still paid higher fees and interest rates in return for approval without documentation or receipt of loans in excess of 80% of property value.  The global head of securitization research at Deutsche Bank noted that "Alt-A is in some ways a sister product to subprime. Some Alt-A pools are very, very close to subprime quality. There is a pretty big divergence (among loan underwriting practices and standards)."  Publications such as Forbes Magazine have called Alt-A loans "subprime in sheep's clothing."

**REMIC and Re-REMIC**

39.     When the value of the CMOs at issue deteriorated, Defendants responded by trying to resecuritize the CMOs into what is sometimes called a Real Estate Mortgage Investment Conduit ("REMIC").  According to the FDIC, "[a] REMIC mortgage derivative is a type of mortgage-backed security that is secured by pass-through mortgage-backed securities or pools of individual loans whose collateral cash flows (principal and interest payments) are divided among multiple tranches/classes to create securities with distinctive risk/return characteristics."

40.     In this instance, the REMIC securities were themselves secured by pre-existing mortgage-backed securities, not individual loans.  Such a REMIC is sometimes referred to as a "Re-REMIC," because the REMIC is created by, in essence, re-packaging pre-existing securities. The issuer typically divides the Re-REMIC into tranches, in the hopes that the upper tranches will gain a higher credit rating.  As lower-ranking bonds from the initial deals fail, the lower quality Re-REMIC tranches would theoretically absorb the resulting losses first.

### STATEMENT OF FACTS

**Defendants' Aggressive Growth Strategy, Reliance upon Real Estate Loans Leading Into and During the Real Estate Market Crash, and Lack of Effective Oversight over Loan Origination and Administration Caused Imperial's Earnings and Stock Price to Plummet**

41.     In the years leading up to Imperial's bankruptcy, real estate and construction ("REC") loans formed the vast bulk of the Bank's and Imperial's assets.  In 2006, REC loans made up 95.8% of the Bank's loan portfolio by dollar amount before allowances for loan losses, increasing to 96.1% in 2007 and 97.0% in 2008.  Of these loans, the vast majority were either multi-family residential loans (64.5% of the Bank's REC portfolio in 2006) or land acquisition, development or construction loans ("ADC") (12% of the Bank's REC portfolio in 2006).

42.     In July of 2010, the Office of Inspector General ("OIG") of the FDIC published a report concerning, among other things, the circumstances relating to the Bank's collapse in 2008 and 2009.  The OIG published its findings in a report entitled July 2010 Material Loss Review ("OIG Report").  In the OIG Report, the OIG noted that the Bank's reliance on REC loans between 2005 and 2008 "substantially exceeded [the Bank's] peer group."  By comparison, as noted in the OIG Report, REC loans typically comprised less than 50% of the loans in the Bank's peer group's portfolios.

43.     As Imperial has publicly acknowledged in numerous public filings, including its Form 10-K for 2008, filed on March 31, 2009, "Our primary source of revenue is net interest income."  Thus, when the real estate market began to decline with ever-increasing speed starting in 2005, the threat to Imperial's bottom line was immediate and substantial.  But Imperial's answer was to *increase* originations of real estate loans.  At Defendants' direction and with their approval, Imperial caused the Bank's origination of real estate loans to increase from $846.7 million in 2005, to $960.1 million in 2006, and $1.05 billion in 2007.

44.     At the same time, at Defendants' direction and with their approval, Imperial caused the Bank's loan origination team to originate loans of larger and larger size, further increasing the impact that any single loan delinquency would have on Imperial's financial condition.  Between 2005 and 2007, the average size of approved loans increased by 47.4%.

45.     The OIG Report noted that, during this time, the Bank pursued an "aggressive growth strategy" in real estate loans "without establishing sound risk management practices to manage the concentrations during the economic downturn."   In particular, the OIG noted that "credit administration practices began to weaken, which impaired the bank's ability to adequately monitor the impact of the economic downturn on its loan portfolio."  The weaknesses noted by the OIG included: (1) failure to properly implement a loan grading system that recognized severity of individual credit weaknesses and assigned appropriate internal grades to individual loans; (2) failure to obtain updated financial information, such that $669 million of the multi-family loans were supported by stale or inadequate financial information; and (3) a practice of "increasing loan commitments to replenish interest reserves when construction or stabilization activities have ceased or are materially behind schedule."  Upon information and belief, Defendants were aware of such weaknesses and either intentionally encouraged, or knowingly or recklessly ignored, them in order to maximize generation of new loans to make up for Imperial's declining interest income.

46.     Given Imperial's reliance on net interest income to fuel its earnings, as the quality of the Bank's REC loan portfolio diminished, so did its earnings.  On August 6, 2007, Imperial released earnings results for the second quarter of 2007.  Net income had declined to $6.0 million, or $1.08 per share (18 cents below estimates).  Even though, as Haligowski noted in the release, "loan production for the quarter and the year…has remained at historically high levels,"

13

net interest income nonetheless decreased to $21.8 million from $24 million during the same period in 2006.

47.    Immediately following the earnings release, Imperial's share price plummeted by 17%, from $36.78 per share on August 6, 2007 to $30.57 per share on August 7, 2007.

48.    Over the next several months, Imperial's failure to maintain control over the Bank's loan grading and approval process, combined with its decision to rely upon REC loans during the worst housing market in decades, continued to backfire.  As more of its high-risk loan portfolio went bad, Imperial's earnings slid further.

49.    On October 30, 2007, Imperial released earnings results for the third quarter of 2007.  Net income declined to $1.7 million, or $0.31 per share, and net interest income for the quarter decreased to $20.7 million from $24.3 million during the same period in 2006.  Imperial acknowledged that the decline was due to "an increase in the level of our non-performing loans and charge-offs during the quarter," although remarkably Haligowski again continued to point to "the resilience of our loan production team and their ability to consistently identify lending opportunities" as a continued factor of strength for Imperial despite the declining housing market.

50.    On February 6, 2008, Imperial released earnings results for the fourth quarter of 2007 and for the year.  Net income declined to $1.1 million, or $0.21 per share, and net interest income for the quarter decreased to $20.2 million from $23.2 million during the same period in 2006.  Haligowski stated that the "results for the quarter reflect the deteriorating economic conditions currently being experienced in the real estate and credit markets."  Haligowski further noted that "[n]et interest income was further negatively impacted by the increase in our cost of

funds as deposits and all other interest bearing liabilities repriced to higher market interest rates, partially offset by the growth in the average balance of our loan portfolio."

51.     As a result of the events described above, Imperial's stock price also slid further, to $21.50 on November 1, 2007, down almost 60% from its 2007 high, and hovered in the $20-25 per share range through early April 2008.

**In An Effort to Prop Up Imperial's Stock Price, Defendants Approve Purchases of Mortgage-Backed Securities, Consciously Disregarding the Known and Substantial Negative Impact such Purchases would have on Imperial**

52.     At the March 18, 2008 meeting of Imperial's Board of Directors, at which all Director Defendants were present, the CMO Investigation Defendants[2] made a presentation to the Director Defendants recommending that the Director Defendants approve the purchase of hundreds of millions of dollars of non-agency CMOs backed by Alt-A residential loans.  The size and scope of the recommended purchase was without precedent in Imperial's history.

53.     The residential loans backing the CMOs in question were issued by IndyMac, WaMu, and Countrywide.  As noted in the OIG Report:  "[t]he majority of the loans supporting the CMOs [purchased by the Bank in 2008] were underwritten in 2006, based on stated income or limited documentation, and were concentrated in California, Arizona, and Florida—states with high home-value depreciation."

54.     The CMO Investigation Defendants' analysis of the CMO acquisition and their presentation on March 18, 2008 focused largely on yield analysis – specifically, the interest income that would be generated immediately as a result of the CMO acquisition.  Upon information and belief, the CMO Investigation Defendants' analysis and presentation to the Director Defendants concerning the potential acquisition of CMOs did not include any

---

[2] As noted *supra*, these Defendants consist of Haligowski, Doyle, and Does 1-10.

meaningful discussion of the following: (a) the foreseeable negative impact of the purchases on Imperial's liquidity and market risks; (b) the impact of downgrades in the credit ratings of the CMOs on the CMOs' value; (c) the increased cost of borrowing funds from secondary sources in order to finance the acquisition of CMOs; or (d) the deepening credit and real estate market crisis and its current and likely future impact on delinquency rates of Alt-A mortgages, such as those backing the CMOs to be purchased.

55.    The CMO Investigation Defendants knowingly or willfully disregarded in their analysis and presentation to the Director Defendants, and Director Defendants knowingly or willfully disregarded, in deciding whether to approve the purchase of CMOs, the clear and public warning signs that the market for and quality of Alt-A loans was in serious decline and that mortgage-backed securities backed by Alt-A loans were extremely risky.  These red flags put each of the Defendants on notice of the true risks Imperial was taking on and the disaster that lay ahead for Imperial because of these risks.  Indeed, between mid-2007 and mid-2008, ratings agencies downgraded *$1.9 trillion* worth of mortgage-backed securities, forcing investment banks to write down billions of dollars in such securities.  Other warning signs included the following:

(a)    Between April 2007 and August 2007, New Century Financial Corp., American Home Mortgage and Ameriquest (all major mortgage lenders) filed for bankruptcy or announced that they were going out of business.

(b)    By August of 2007, Moody's and S&P had placed almost 300 classes of mortgage-backed securities backed by Alt-A residential loans (constituting over a billion dollars of loans) on "credit watch," due to "a rising level of delinquencies among the Alt-A collateral supporting these transactions, as well as [S&P's]

expectation that losses on the collateral will exceed historical precedent and may exceed our original expectations." On September 3, 2007, S&P downgraded its rating for 158 classes of Alt-A mortgage-backed securities.

(c)     Shares of the largest Alt-A lenders – Countrywide and IndyMac – dropped almost 25% in a period of two weeks in August 2007.

(d)     Countrywide barely avoided joining these institutions by taking out an emergency loan of $11 billion from a group of banks on August 16, 2007.

(e)     By August 2007, Countrywide had almost entirely abandoned the Alt-A loan business. IndyMac followed suit by the end of the year.

(f)     Further and increasingly severe downgrades followed throughout the remainder of 2007, specifically including downgrades of securities backed by Alt-A loans from WaMu, IndyMac, and Countrywide.

(g)     In September 2007, the Congressional Research Service reported that defaults and foreclosures were likely to rise even higher in 2007 and the first half of 2008.

(h)     In January 2008, ratings agencies again downgraded mortgage-backed securities backed by Countrywide's and IndyMac's Alt-A loans. In late April 2008 alone, more than $50.0 billion of Alt-A-backed securities were downgraded by credit-rating agencies Moody's and Standard & Poor's.

(i)     On January 11, 2008, Bank of America agreed to purchase Countrywide for $7.16 per share, down from $44.55 per share less than a year before.

(j)     By March 2008, Alt-A delinquencies overall had risen to 17.4% (compared to less than 3% at the same time a year ago). By the end of April

17

2008, nearly 19.3% of Alt-A borrowers whose loans originated in 2006 were delinquent.

56.     In addition, upon information and belief, the CMO Investigation Defendants did not investigate or discuss in their presentation to the Director Defendants at the March 18, 2008 meeting, and the Director Defendants knowingly disregarded in deciding to approve the CMO acquisitions, the foreseeable likelihood that acquisition of the CMOs would further decrease the Bank's ability to maintain certain required regulatory capital ratios or the resulting impact on Imperial.  The Bank was required by federal and state regulatory authorities to maintain adequate levels of capital to support its operations; these levels of capital are referred to as "capital ratios." A bank that is insufficiently capitalized can lose access to critical secondary sources of borrowing, including the very sources upon which the Bank was already heavily relying at the time Defendants approved the CMO acquisition.

57.     Further, upon information and belief, the CMO Investigation Defendants and the Director Defendants relied upon a risk assessment concerning the CMO acquisition that was provided by a third-party trust investment firm, which firm also simultaneously promoted the CMO acquisition to the CMO Investigation Defendants and the Director Defendants, subsequently acted as financial advisor for the Board of Directors in selecting the CMOs to be acquired, and acted as the broker in the vast majority of the CMO acquisitions, giving rise to a substantial conflict of interest.  Upon information and belief, the CMO Investigation Defendants and the Director Defendants knew of the investment firm's conflict of interest either at the time the investment firm provided its assessment, shortly thereafter, or both, but willfully disregarded that conflict of interest.

58.     Upon information and belief, each of the Director Defendants were aware of the inadequate nature of the investigation and presentation by the CMO Investigation Defendants concerning the CMO acquisition.  Each of the Director Defendants knew of the substantial short-term and long-term risks posed by the CMO acquisition to the Bank's and Imperial's liquidity, credit, and earnings, and the need to fully vet and analyze those risks.  Yet, upon information and belief, none of the Director Defendants conducted any independent investigation into the benefits and risks of the CMO acquisition recommended by the CMO Investigation Defendants.  Upon information and belief, none of the Director Defendants requested that any employee of Imperial or the Bank conduct a further investigation into the clear risks posed by the proposed CMO purchases.  Instead, in conscious disregard of the risks posed by the CMO acquisition and the completely inadequate presentation by the CMO Investigation Defendants concerning those risks, the Director Defendants unanimously approved the acquisition of CMO securities at the March 18, 2008 Board of Directors meeting.

59.     Between March and September 2008, at Defendants' direction, Imperial caused the Bank to acquire approximately $826 million of CMOs (the "CMO Portfolio").

60.     Upon information and belief, the Director Defendants approved the CMO Portfolio based primarily upon their belief that the CMO Portfolio would result in additional interest income.  Upon information and belief, the Director Defendants – and all other Defendants – believed that the additional income would provide a superficial boost to Imperial's earnings, thus helping to halt or reverse the deepening slide in Imperial's stock price.  Upon information and belief, and as described in more detail *infra*, Defendants believed that this boost to earnings would also boost the value of purchases in Imperial stock that Defendants had

already made or would make prior to the public announcement of the size and scope of Imperial's CMO Portfolio acquisition.

61.    This anticipated interest income was illusory, however, as the income was obtained only at the cost of immediate increased credit risk, exponentially increased exposure to the volatile housing market, and substantially reduced liquidity.  Thus, the CMO Portfolio provided no actual short-term or long-term benefit to Imperial.

**Prior to Imperial's Public Disclosure of the Size and Scope of its CMO Portfolio, Defendants Make Significant Purchases of Imperial Stock**

62.    Upon information and belief, certain of the Defendants, including, *inter alia*, the CMO Investigation Defendants, had been investigating a possible purchase of CMOs for weeks or even months before the March 18, 2008 Board of Directors meeting.  Upon information and belief, some or all of the Director Defendants were aware before the March 18, 2008 Board of Directors meeting that the CMO Investigation Defendants intended to recommend to the Director Defendants that Imperial cause the Bank to purchase the CMOs.

63.    Between the time when Defendants learned of the CMO acquisition and July 15, 2008, most of the Defendants made significant purchases of Imperial stock.[3]  Upon information and belief, each of the Defendants who purchased stock during this time made these purchases with the intention of profiting from what they believed would be a boost to Imperial's share price once certain information regarding the scope of the CMO Portfolio – and resulting illusory short-

---

[3]  Some of these purchases were made indirectly through receipt of deferred compensation.  However, upon information and belief, the terms of the relevant deferred compensation plan allowed Defendants to elect, and Defendants did in fact elect, both the timing of their deferred compensation and whether to receive their deferred compensation in the form of stock instead of cash.

In addition, several Defendants indirectly acquired stock during this time through their participation in Imperial's Supplemental Executive Retirement Plan.  Plaintiff has omitted these acquisitions from the Complaint at this time because, upon information and belief, Defendants did not have the ability to elect the timing of such acquisitions and/or whether to receive their deferred compensation in the form of stock instead of cash.  Plaintiff reserves the right to amend the Complaint to add such transactions at a later date.

term additional interest income – was made public.  For several of the Defendants, these purchases were the first such direct purchases in many months.

64.    Defendants' purchases of stock can be divided into two periods.  First, between the time when Defendants became aware of an impending acquisition of the CMO Portfolio and a critical Board of Directors meeting on May 20, 2008, several Defendants acquired Imperial stock.  These acquisitions included the following:

| Date | Purchase | Amount | Price |
|---|---|---|---|
| 2/1/08 | Jeffrey Lipscomb | 1000 | $18 |
| 2/2/08 | Oribe Hirotaka | 1000 | $18 |
| 2/8/08 – 2/12/08 | George Haligowski | 12840 | $23.13-23.50 |
| 2/13/08 – 2/15/08 | George Haligowski | 16141 | $24.15-24.95 |
| 2/15/08 | Norval Bruce | 828 | $24.25-24.35 |
| 2/21/08 | George Haligowski | 11059 | $26.02-26.76 |
| 2/29/08 | Norval Bruce | 238 | $24.25 |
| 3/5/08 | Richard Reed | 1000 | $14 |
| 4/14/08 | Norval Bruce | 640 | $17.36-17.54 |
| 4/22/08 | Jeffrey Lipscomb | 1000 | $14 |
| 5/05/08 – 5/06/08 | Timothy Doyle | 3886 | $13.48-13.60 |
| 5/06/08 | Phillip Lombardi | 1650 | $13.08 |

65.    On April 30, 2008, Imperial made certain minimal disclosures relating to its acquisition of a small amount of CMO securities.  Specifically, in its earnings release, Imperial disclosed its earnings for the first quarter of 2008 and disclosed that in the first quarter of 2008 the Bank had "purchased approximately $57.6 million of triple-A rated corporate sponsored collateral mortgage obligations, which we classified as held-to-maturity."  This was the full extent of the disclosures relating to the CMO purchase in the April 30, 2008 earnings release.

66.    With the approval and knowledge of each of the Defendants, Imperial did not disclose in its April 2008 earnings release that it planned to cause the Bank to purchase hundreds

of millions of dollars in additional collateral mortgage obligations.  Nor did Imperial disclose that, since the end of the first quarter of 2008 (*i.e.*, March 31, 2008), the Bank had continued to purchase additional CMO securities.  Upon information and belief, by April 30, 2008, the Bank had acquired additional CMO securities beyond those identified in its April 30, 2008 earnings release.  Nor did Imperial disclose the interest rate for those securities or the projected impact of the purchase of these securities upon net interest income.  Indeed, according to the April 30, 2008 release, interest income for the first quarter of 2008 had decreased from the prior quarter.

67.    Due to the limited disclosure related to Imperial's plan for the Bank to acquire a significant amount of CMO securities, the news media did not report on the Bank's acquisition of the CMO securities.  As a result, Imperial's April 30, 2008 earnings release had little or no impact, and certainly no positive impact, on the market for Imperial's stock.  Between April 30, 2008 and the meeting of Imperial's Board of Directors on May 20, 2008, Imperial's stock price declined from $15.07 to $10.38.

68.    During a discussion of Imperial's declining stock price at the May 20, 2008 Board of Directors meeting, at which each of the Director Defendants was present, Doyle acknowledged that the public was currently unaware of the Bank's large-scale purchases of CMOs.  Doyle further stated that he intended to "address" Imperial's declining stock price via the second quarter earnings release (which typically occurs at the end of July each calendar year).  Upon information and belief, all Defendants understood that any positive earnings result for the second quarter of 2008 would be attributable to the illusory interest income from the CMO Portfolio acquired in the prior months.

69.     At that same May 20, 2008 Board of Directors meeting, Haligowski announced his intention to increase his holdings of Imperial stock to over 100,000 shares, as well as his intention to publicize his purchases once he had established his holdings.

70.     Numerous Defendants made an additional rash of purchases shortly after the May 20, 2008 meeting, at which Doyle noted that the July earnings release would announce the acquisition of the CMO Portfolio and the resulting cosmetic impact upon earnings.  The post-May 20, 2008 purchases of Imperial stock included the following:

| Date | Purchase | Amount | Price |
|---|---|---|---|
| 5/21/08 | Richard Reed | 1000 | $10.82-$10.86 |
| 5/20/08-5/21/08 | George Haligowski | 55100 | $10.00-$10.35 |
| 5/23/08 | Sandor Mayuga | 5000 | $10.64-$10.75 |
| 5/30/08 | Philip Lombardi | 1000 | $10.00 |
| 6/4/08 | George Haligowski | 8100 | $10.47-10.64 |
| 6/9/08 | Philip Lombardi | 1000 | $9.07-$9.08 |
| 6/9/08 | Norval Bruce | 1000 | $9.10-$9.12 |
| 6/12/08 | Scott Wallace | 5000 | $8.55-$8.90 |
| 6/13/08 | Philip Lombardi | 1000 | $8.22 |

71.     On June 3, 2008, Imperial issued a press release trumpeting Haligowski's purchases of additional Imperial shares.  The press release, however, said nothing about the CMO Portfolio.  Regarding Haligowski's reason for purchasing Imperial stock, the press release stated only that the purchase "reflects [Haligowski's] continuing confidence in the Company and its opportunities."

72.     The stock price continued to drop after the press release of June 3, 2008. Between June 3, 2008 and a June 25, 2008 meeting of the Executive Committee of Imperial's Board of Directors ("XCOM") (including Haligowski, Oribe and Bruce), Imperial's stock price decreased from $9.80 to $6.71.

73.     At the June 25, 2008 XCOM meeting, the continuing drop in Imperial's stock price prompted Haligowski, Oribe and Bruce to revisit the date they had previously picked to announce the CMO Portfolio.  During the June 25, 2008 meeting, the XCOM members specifically noted their desire to release earnings earlier than the filing of Imperial's 10-Q for the second quarter of 2008.  Imperial's XCOM therefore decided to make an earnings announcement in mid-July.  Upon information and belief, XCOM acted with full authority and approval from all Director Defendants.

**Announcement of CMO Program Followed by Run-Up in Stock Price**

74.     On July 15, 2008, Defendants caused Imperial to release its earnings report for quarter ended June 30, 2008 (the "July 2008 Earnings Release").  Imperial announced earnings of $2.43 million, the result of a 13.5% increase in interest income to $24.8 million, compared to $21.8 million for the same period in the prior year.  Imperial acknowledged that the increase in interest income was primarily due to "the purchase of approximately $784.6 million of AAA rated corporate sponsored collateralized mortgage obligations (CMOs) during the current year, which are secured by Alt-A first lien residential mortgage loans, predominantly all of which carry fixed interest rates."

75.     However, the July 2008 Earnings Release entirely omitted any discussion of the material risks associated with the CMO Portfolio.  The July 2008 Earnings Release contained no information about: (1) the deteriorating quality of the loan pool underlying the CMO Portfolio; (2) the impact of the CMO Portfolio on the Bank's ability to remain adequately capitalized; (3) the fact that the value of the CMO Portfolio depended substantially on unpredictable credit ratings; or (4) the impact of the CMO Portfolio upon credit and cost of funds.

76.     In fact, the July 2008 Earnings Release presented an entirely one-sided and distorted view of the CMO Portfolio acquisition, exemplified by this statement from Haligowski:

24

"These AAA rated CMO investments represent opportunistic acquisitions that have been matched funded to lock an expected spread over our cost of funds of approximately 4.5%.  <u>We feel comfortable with the risk profile of these securities</u> given the credit enhancements provided by the purchase price discounts and credit subordination in the bond structures.  We anticipate that these acquisitions will provide a significant increase to our net interest income and, at a time of limited loan origination activity, will provide the Company with an additional revenue stream beyond our core lending products."  (Emphasis added.)

77.     Imperial's Form 10-Q for the second quarter of 2008 was released two weeks later on July 30, 2008, with the approval and at the direction of Defendants, and signed by Haligowski and Doyle.  That Form 10-Q also failed to include any discussion of the risks associated with the acquisition of the CMO Portfolio.  Even the boilerplate risk warnings in the Form 10-Q contained no discussion of any risks specifically attributable to the CMO Portfolio.  The same was true of Imperial's Form 10-Q for the third quarter of 2008, released on October 30, 2008, with the approval and at the direction of Defendants.

78.     Based upon the distorted presentation and material omissions contained in the July 2008 Earnings Release, Imperial's share price increased substantially.   Indeed, between July 14, 2008 and July 22, 2008, Imperial's share price rose from its historic low of $3.36 to $7.51, a 123.5% increase.  Imperial's share price continued to rise throughout August, reaching a high of $11.33 at the close of the market on August 11, 2008, and remained as high as $10.24 on September 19, 2008.

**<u>Defendants' Course of Conduct Leaves Imperial Disproportionately Vulnerable to the Accelerated Decline of Housing, Credit and Stock Markets, Ultimately Forcing Imperial into Bankruptcy</u>**

79.     Defendants' conscious disregard of the foreseeable and immediate risks associated with the acquisition of the CMO Portfolio turned out to be disastrous.  As noted

above, the value of the CMO Portfolio was particularly vulnerable to any number of factors, including credit crises, stock market downturns, and ratings downgrades.

80.    Defendants' course of conduct, as described herein, proximately caused harm to Imperial in a number of different ways.

    a.    First, as noted in the OIG Report, nearly 90 percent of the CMO Portfolio migrated to sub-investment grade and became adversely classified by December 31, 2008 (contrary to Imperial's Form 10-K for 2008, which stated that the figure was 65.4%). This, in turn, caused Imperial to suffer significant operating losses. By March 31, 2009, Imperial had written off $9 million of its CMO portfolio as a credit loss, and additional writeoffs followed.

    b.    Second, the losses in the CMO Portfolio, combined with the commitment of so much capital to the CMO Portfolio, caused the Bank to be unable to maintain risk-weighted capital ratios in excess of the minimum capital ratios required for the Bank to be considered "well capitalized" by regulatory agencies. Imperial acknowledged in its 10-K for 2009 that "[b]ecause of the investment rating downgrades associated with our portfolio of CMOs, the Bank is required to maintain higher levels of regulatory risk-based capital for these securities due to the greater perceived risk of default." As the CMO Portfolio was downgraded, the change in risk-weighting caused the Bank to first fall to the "adequately capitalized" level in January 2009, and then to "undercapitalized" in June of 2009.

c.      Third, the Bank's and Imperial's liquidity and ability to borrow critical funds to stay in operation decreased.  Even before Imperial caused the Bank to establish the CMO Portfolio, Imperial had announced that the Bank's and Imperial's reliance upon secondary funding sources bearing higher interest rates was reducing earnings.  This problem was exacerbated with the acquisition of the CMO Portfolio, as the securities were purchased almost entirely through secondary funding sources, such as loans from the Federal Home Loan Banks ("FHLB") and "brokered deposits."  Not only did these borrowing sources cost more than Imperial's reliance on "core deposits" (such as savings accounts maintained at the Bank itself), but using such sources required the Bank to maintain a sound credit risk profile.  When the Bank's assets were deemed not to be "well capitalized," the Bank's and Imperial's access to such sources of funding was cut off, accelerating its downfall.

d.      As a result, Imperial's financial stability and ability to remain a going concern declined substantially.

81.      Not surprisingly, Imperial's stock price cratered.   Between October 1, 2008 and January 1, 2009, Imperial's stock price dropped from $9.53 to $2.25, a 76% decline.

82.      As of December 29, 2008, the New York Stock Exchange had delisted Imperial's stock for failure to meet the minimum global market capitalization requirements.

83.      In Imperial's 10-K for the year 2008, filed on March 31, 2009, Ernst & Young, Imperial's independent outside auditor, noted that Imperial's financial condition "raises substantial doubt about [Imperial's] ability to continue as a going concern."  This opinion was a

clear indication to Defendants that Imperial was in imminent danger of becoming insolvent. Indeed, in Imperial's 10-Q for the second quarter of 2009, filed on May 15, 2009, Imperial itself noted that its financial condition "raise[s] substantial doubt about the Company's ability to continue as a going concern."

84.     Upon information and belief, each of the Defendants understood as of the end of 2008 that Imperial was either insolvent or in imminent danger of becoming insolvent.  Further, upon information and belief, in approving the acquisition of the CMO Portfolio, Defendants had known but consciously disregarded the substantial risk that the acquisition of the CMO Portfolio could leave Imperial with insufficient capital to continue its business.  Upon information and belief, by the end of 2008, Defendants were well aware that the acquisition of the CMO Portfolio had very likely left Imperial with insufficient capital to continue its business.

85.     Nonetheless, upon information and belief, each of Defendants consciously disregarded Imperial's financial condition, and decided to wrongfully prolong and perpetuate the existence of Imperial in order to profit from its continuation and avoid the scrutiny of a bankruptcy proceeding.

86.     Specifically, Defendants decided to repackage the CMO Portfolio in an ill-conceived attempt to gain different credit rating treatment for the CMO Portfolio.  At a special Board of Directors meeting on November 28, 2008, the Director Defendants discussed various emergency measures to prop up the value of the portfolio.  Haligowski suggested that the bond portfolio be resecuritized into a REMIC.  Essentially, the process would involve consolidating the 83 separate bonds into three or four bonds, divided into tranches and re-rated by the ratings agencies at an investment grade level, a process commonly referred to as "Re-REMIC."  The Director Defendants approved Haligowski's recommendation.

87.     By December 23, 2008, the Re-REMIC process was completed, the repackaged securities were offered for sale by a newly created wholly-owned subsidiary of the Bank called the "Imperial Capital Bank Resecuritization Trust," and ratings agency DBRS rated the newly structured "Mortgage Resecuritization Notes, Series 2008-1" as investment grade.

88.     But Defendants' ploy was ultimately unsuccessful, in large part because – not surprisingly – Defendants were unable to find buyers for any of the newly created REMIC notes. As a result, the FDIC rejected the Bank's proposed risk-weighting for the REMIC notes.  The REMIC re-securitization merely delayed Imperial's bankruptcy filing until December of 2009.

89.     During those ten months, the Defendants continued to receive salary and benefit payments from Imperial.  Furthermore, Defendants caused Imperial to make substantial payments to numerous consultants including, without limitation:  (1) consultants and attorneys retained by Imperial for the purpose of executing the REMIC re-securitization; (2) consultants retained by Imperial to provide advice regarding personnel issues; (3) consultants retained by Imperial to provide advice concerning capital markets issues; and ( 4) consultants and attorneys retained by Imperial to provide advice concerning responses to various regulatory requests and directives.

**Defendants Fail to Retain An Interim or Permanent Chief Executive Officer for Eight Months Following Haligowski's Departure From Imperial in February, During Which Time Imperial Slides Irreversibly into Bankruptcy**

90.     On February 17, 2009, Haligowski informed Bruce that he was taking a leave of absence to deal with a medical emergency.  Upon information and belief, Haligowski's duties as Chief Executive Officer had included (1) orchestrating communications and negotiations with regulatory agencies; (2) overseeing Imperial's strategy and efforts, however dubious, to raise sufficient capital to stay in business; (3) overseeing Imperial's strategy and efforts to restructure

the Bank's CMO Portfolio; and (4) overseeing Imperial's belated strategy and efforts to sell off or otherwise shrink the Bank's REC loan portfolio.

91.     At Imperial's Board of Directors meeting on February 25, 2009 attended by Bruce, Lipscomb, Mayuga, Oribe and Reed, the Director Defendants unanimously approved a Board of Directors resolution placing Haligowski on provisional leave of absence.

92.     However, at the same meeting, the Director Defendants unanimously approved a Board of Directors resolution to give the XCOM the decision-making authority of the position of Chief Executive Officer.  As of that time, XCOM consisted of only Bruce and Oribe, as Haligowski had taken a leave of absence.  As of December 31, 2008, Bruce had retired as an executive officer of Imperial, and subsequently served only in his capacity as Vice-Chairman and a member of Imperial's Board of Directors.

93.     Upon information and belief, neither Bruce nor Oribe nor any other Imperial employee had any experience as Chief Executive Officer of a financial institution comparable in size or complexity to Imperial.  Upon information and belief, Defendants were well aware that no Imperial employee possessed the requisite skills to act as Chief Executive Officer, but willfully disregarded this fact.

94.     On April 20, 2009, FDIC examiners conducted a follow up examination of the Bank.  The examination went badly.  Among other things, the examiners noted numerous failures in the Defendants' due diligence process relating to their decision to approve the acquisition of the CMO Portfolio, including the following:

> Imperial had not conducted a comprehensive analysis and modeling prior to purchase to determine the impact on credit, capital, liquidity, and market risks. . . . Imperial . . . [did] not properly assess[ ] the risk of the non-agency CMO purchase program to the institution prior to implementation. Instead, the Board relied on an assessment by a third-party trust investment firm, which promoted the program and acted as

financial advisor for selecting the securities as well as broker in the vast majority of the purchases. Examiners concluded that Imperial's management had focused on yield analysis and failed to consider the impact of the program on liquidity and market risks.

95.    Upon information and belief, even after the April 20, 2009 FDIC examination (more than 2 months after the commencement of Haligowski's leave of absence), the Director Defendants did not attempt to find an interim or permanent Chief Executive Officer with sufficient experience to handle the issues facing Imperial.  As of April 20, 2009, the Director Defendants knew that Haligowski was still on medical leave.  Upon information and belief, the Director Defendants either did not know when Haligowski would return from medical leave or had determined that Haligowski should be replaced as Chief Executive Officer of Imperial.

96.    In spite of the lack of any clear candidate within Imperial to serve as Chief Executive Officer, in or about April of 2009, the Director Defendants retained a consulting firm to analyze the capability of certain internal candidates to take on the Chief Executive Officer position on an interim basis, including Lodwick and Doyle.  On June 4, 2009, more than a month later, the consulting firm reported to the Director Defendants that both Lodwick and Doyle "needed additional skill enhancement [in order to serve as Chief Executive Officer of Imperial,]" and recommended that Imperial "look[ ] outside for an individual to serve as CEO for the long term."

97.    Only after the consulting firm's June 4, 2009 report did the Director Defendants begin to look for an outside candidate to take over the position of Chief Executive Officer of Imperial.  As a result of this search, the Director Defendants ultimately identified Joseph Kiley, III ("Kiley").  The Director Defendants hired Kiley as a consultant to Imperial's board of directors in July of 2009.  On October 1, 2009, the Director Defendants hired Kiley to become Imperial's new Chief Executive Officer.

98.     But by this time, the damage caused to Imperial by Defendants' decisions, as alleged *supra*, appears to have been irreversible.  Neither the Bank nor Imperial was unable to raise sufficient capital to maintain their operations in the face of hemorrhaging losses to its CMO Portfolio and REC loan portfolio, and was unable to give satisfactory responses to regulatory agencies' directives.  On December 18, 2009, the FDIC closed the Bank and took over operations in receivership.  Imperial filed for bankruptcy that same day.

99.     Throughout 2009, the Director Defendants were well aware of the urgent need for a Chief Executive Officer to orchestrate Imperial's response to the substantial problems in the Bank's REC loan portfolio, the sharp drop in value of the CMO Portfolio, and the resulting regulatory attention from the FDIC and CDFI.  Upon information and belief, the Director Defendants willfully disregarded these facts until it was too late.

### Demand on Imperial's Current Board of Directors Would Be Futile

100.     Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

101.     As debtor in possession, Imperial in this chapter 11 case possesses all of the rights and powers ordinarily granted to a trustee, including the power to decide whether and when to commence an adversary proceeding against third parties to recover money or property for the estate.  11 U.S.C. §1107(a).

102.     As of the time of the filing of this action, Imperial's Board of Directors consists entirely of Defendants Haligowski, Bruce, Mayuga, Oribe, and Reed.  Plaintiff did not make a demand on Imperial's Board of Directors to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

103.     Demand would be futile because this Complaint alleges with particularity that each of Imperial's current Board of Directors, at the time of the filing of this action, breached

their fiduciary duties of care, loyalty, reasonable inquiry, oversight, and good faith.  Each member of Imperial's current Board of Directors' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on intentional, willful or disloyal misconduct.

104.    Because each member of Imperial's current Board of Directors faces a substantial likelihood of liability, each such person is self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of Imperial's bankruptcy estate.

## COUNT I

### Breach Of Fiduciary Duty
### (Against all Defendants)

105.    The Committee repeats and realleges each and every allegation above as if fully set forth herein.

106.    By virtue of his position as either an officer or director of Imperial, a fiduciary relationship existed between each Defendant and Imperial.

107.    As a fiduciary, each Defendant was obligated by his duty of loyalty to act in a fully informed manner, in a manner consistent with the interests of Imperial, and with the highest degree of good faith.

108.    As a fiduciary, each Defendant also was obligated by his duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

109.    Upon information and belief, each of Defendants breached his fiduciary duties to Imperial – including the duties of loyalty, care, good faith, reasonable inquiry, oversight, and supervision – and acted knowingly, recklessly, with gross negligence or willfully blindly, by engaging in a course of conduct that includes the following:

(a)     knowingly, recklessly, with gross negligence, or willfully blindly failing to maintain adequate controls over loan origination, administration, analysis and grading;

(b)     knowingly, recklessly, with gross negligence, or willfully blindly approving Imperial's efforts to cause the Bank to originate REC loans, while knowingly, recklessly, with gross negligence, or willfully blindly disregarding the numerous red flags concerning the foreseeably disastrous consequences of approving such increases during the worst housing and credit market in decades;

(c)     knowingly, recklessly, with gross negligence, or willfully blindly abdicating his duty to investigate and inform himself properly of the effect of the CMO Portfolio on Imperial;

(d)     approving the retention of an investment firm to advise Defendants concerning the impact of the CMO Portfolio while knowingly, recklessly, with gross negligence, or willfully blindly disregarding the investment firm's self-interested role in the CMO Portfolio transaction;

(e)     knowingly, recklessly, with gross negligence, or willfully blindly failing to conduct any independent investigation on behalf of Imperial in connection with the approval of the establishment of the CMO Portfolio;

(f)     knowingly, recklessly, with gross negligence, or willfully blindly approving the acquisition of the CMO Portfolio for the purpose of gaining an entirely illusory short-term boost to Imperial's earnings, while knowingly, recklessly, with gross negligence, or willfully blindly

disregarding the foreseeable and disastrous consequences of such an acquisition;

(g)    deciding to approve the establishment of the CMO Portfolio with the intention of maintaining or increasing the value of his then-recent purchases of Imperial common stock, thereby self-dealing and failing to act in good faith;

(h)    intentionally establishing his position in Imperial common stock prior to making news of the CMO Portfolio public, with the knowledge that publication of the fact of the CMO Portfolio and its illusory short-term impact on interest income would cause Imperial's stock price to rise and with the intention of profiting from such stock price increase;

(i)    causing Imperial to withhold material and negative information regarding the CMO Portfolio, its negative impact on Imperial and the risks associated with the acquisition of the CMO Portfolio from the public, with the knowledge that the resulting one-sided presentation of the CMO Portfolio and its illusory short-term impact on interest income would cause Imperial's stock price to rise and with the intention of profiting from such stock price increase;

(j)    Knowingly, recklessly, with gross negligence or willfully blindly disregarding concerns regarding Imperial's inability to continue as a going concern, and instead pursuing a re-securitization of the CMO Portfolio while causing Imperial to make significant payments to Defendants and various third party consultants, advisors and attorneys throughout 2009;

(k)     Refusing to search for and retain a Chief Executive Officer between February 2009 and June 2009, while knowingly, recklessly, with gross negligence or willfully blindly disregarding (1) Imperial's need for a Chief Executive Officer to navigate through multiple crises during that time and (2) the lack of experience and knowledge of Imperial's own employees to act as Chief Executive Officer of Imperial during such crises; and

(l)     not acting in the best interests of Imperial.

110.    Moreover, upon information and belief, most of Defendants purchased shares in Imperial prior to and immediately following approval of the CMO Portfolio acquisition.  Upon information and belief, due to their direct financial stake in the CMO Portfolio acquisition, these Defendants were interested in, or lacked independence with respect to, the acquisition of the CMO Portfolio.

111.    Defendants' course of conduct as alleged herein, including the acquisition of the CMO Portfolio, favored Defendants at the expense of Imperial and its other stakeholders.  Under the circumstances, Defendants acted in their own interests in engaging in the course of conduct alleged herein, including approving or facilitating the acquisition of the CMO Portfolio, even though they knew or were reckless in not knowing that it would result in harm to Imperial.  At a minimum, Defendants were willfully blind to the foreseeable disastrous consequences of their course of conduct, including the approval of the CMO Portfolio acquisition, and acted grossly negligently or recklessly in approving or facilitating transactions that in short order would result in disaster for Imperial.

112.    Defendants are not entitled to the protection of the business judgment rule for the breach of their duties.  Defendants failed to act in good faith and instead acted in their own interests, or in a manner that cannot be attributed to a rational business purpose.  Finally, in

reaching the decisions complained of herein, Defendants were grossly negligent or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully ignoring their duties owed to Imperial and to all of Imperial's stakeholders.

113.    In taking the actions described above with respect to the course of conduct described herein, including the approval of the CMO Portfolio, Defendants abandoned Imperial's interests altogether.  Defendants knowingly and intentionally acted in the sole pursuit of their personal individual interests (such as maintaining or increasing the value of their recently acquired Imperial holdings).  They did not act in order to achieve any benefit, or accomplish any legitimate corporate purpose for Imperial, either short-term or long-term.  To the contrary, they engaged in actions that did not confer any benefit upon or serve any corporate purpose for Imperial and that could never have conferred any such benefit or served any such purpose.  The events that unfolded show that the actions they took were entirely adverse to Imperial's interests, both short-term and long-term.  Notwithstanding the positions of trust that Defendants occupied and the fiduciary duties they owed to Imperial, Defendants acted in service of interests wholly separate and distinct from those of the company they were obligated to serve.  Imperial and its stakeholders have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Defendants.  Accordingly, Plaintiff is entitled to judgment against Defendants jointly and severally in an amount to be determined at trial.

**COUNT II**

**Breach Of Fiduciary Duty**
**(Against the CMO Investigation Defendants)**

114.    The Committee repeats and realleges each and every allegation above as if fully set forth herein.

37

115.    By virtue of the positions that the CMO Investigation Defendants held with Imperial, a fiduciary relationship existed between each of them and Imperial.

116.    As fiduciaries, the CMO Investigation Defendants were obligated by their duty of loyalty to act in a fully informed manner, in a manner consistent with the interests of Imperial, and with the highest degree of good faith.

117.    As fiduciaries, the CMO Investigation Defendants were also obligated by their duty of care to act at all times using the amount of care that a reasonable person would use under similar circumstances.

118.    Upon information and belief, some or all of the CMO Investigation Defendants purchased shares in Imperial prior to and immediately following approval of the CMO Portfolio acquisition.  Due to their direct financial stake in the CMO Portfolio acquisition, the CMO Investigation Defendants were interested in, or lacked independence with respect to, the acquisition of the CMO Portfolio.

119.    The CMO Investigation Defendants proposed, negotiated, and facilitated the acquisition of the CMO Portfolio.  In doing so, the CMO Investigation Defendants acted in their own interests in facilitating consummation of the CMO Portfolio acquisition even though they knew or should have known it would result in harm to Imperial.  At a minimum, the CMO Investigation Defendants were willfully blind to the foreseeable disastrous consequences of the CMO Portfolio acquisition, and acted grossly negligently or recklessly in advocating for and facilitating consummation of a transaction that in short order would result in disaster for Imperial.

120.    Upon information and belief, the CMO Investigation Defendants failed to exercise the necessary care, and breached their duties of good faith, care and loyalty, by, among other things:

(a)    advocating for and facilitating consummation of the imprudent CMO Portfolio acquisition that ultimately rendered Imperial insolvent, and knowingly, recklessly, grossly negligently or willfully blindly disregarding the foreseeable disastrous consequences of the CMO Portfolio acquisition;

(b)    advocating for and facilitating consummation of the CMO Portfolio acquisition even though it favored interests other than those of the company that they were obligated to serve; and

(c)    intentionally, knowingly, recklessly, with gross negligence, or willfully blindly withholding information from the Outside Director Defendants, including information about the foreseeable disastrous consequences of the CMO Portfolio acquisition, including, without limitation, the short-term and long-term harm to Imperial's liquidity, credit risk, and exposure to the collapsing housing market and credit crisis.

121.    The CMO Investigation Defendants are not entitled to the protection of the business judgment rule for the breach of their duties.  The CMO Investigation Defendants failed to act in good faith and instead acted in their own interests, or in a manner that cannot be attributed to a rational business purpose.  Finally, in reaching the decisions complained of herein, the CMO Investigation Defendants were grossly negligent or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully ignoring their duties owed to Imperial and to all of Imperial's stakeholders.

122.     Upon information and belief, in taking the actions described above with respect to the approval of the CMO Portfolio, the CMO Investigation Defendants abandoned Imperial's interests altogether.  Upon information and belief, Haligowski, Doyle, and Does 1-10 knowingly and intentionally acted in the sole pursuit of their personal individual interests (such as maintaining or increasing the value of their recently acquired Imperial holdings).  They did not act in order to achieve any benefit, or accomplish any legitimate corporate purpose for Imperial, either short-term or long-term.  To the contrary, they engaged in actions that did not confer any benefit upon or serve any corporate purpose for Imperial and that could never have conferred any such benefit or served any such purpose.  The events that unfolded show that the actions they took were entirely adverse to Imperial's interests, both short-term and long-term. Notwithstanding the positions of trust that Haligowski, Doyle, and Does 1-10 occupied and the fiduciary duties they owed to Imperial, they each acted in service of interests wholly separate and distinct from those of the company they were obligated to serve.

123.     Imperial and its stakeholders have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by Haligowski, Doyle, and Does 1-10. Accordingly, Plaintiff is entitled to judgment against Haligowski, Doyle, and Does 1-10 jointly and severally in an amount to be determined at trial.

## **RESERVATION OF RIGHTS**

124.     This Complaint is based on the investigation conducted by the Committee to date. The Committee believes that additional claims in favor of the Debtor's estate against Defendants or other parties may exist.  The Committee reserves any and all rights to bring such claims to the extent authorized by the Court or applicable law.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff prays for judgment:

(1)    awarding Plaintiff judgment in an amount to be determined at trial, including compensatory and punitive damages;

(2)    awarding Plaintiff its attorneys' fees, costs and other expenses incurred in this action;

(3)    awarding Plaintiff pre-and post-judgment interest at the legal rate; and

(4)    granting Plaintiff such other and further relief as the Court deems appropriate.

Dated:  July 15, 2011

**AKIN GUMP STRAUSS HAUER & FELD LLP**

/s/ *David P. Simonds*
David P. Simonds

David P. Simonds
Hyongsoon Kim
Christina M. Padien
2029 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 229-1000
Facsimile:  (310) 229-1001

*Counsel to the Official Committee of Unsecured Creditors of Imperial Capital Bancorp, Inc.*