GARY E. KLAUSNER (STATE BAR NO. 69077)
GREGORY K. JONES (STATE BAR NO. 181072)
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Telecopy: (310) 228-5788

[Proposed] Reorganization Counsel for
Debtor and Debtor in Possession

Debtor's Mailing Address:
Post Office Box 2283
La Jolla, California 92037-2283

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 09-_____ |
| IMPERIAL CAPITAL BANCORP, INC., a Delaware corporation, | Chapter 11 |
| Debtor. | **DECLARATION OF JOSEPH W. KILEY, III IN SUPPORT OF FIRST DAY MOTIONS** |
| Tax Identification Number: | |
| 95-4596322 | |

534302v1

I, Joseph W. Kiley, III, declare as follows:

## INTRODUCTION

1. I am over 18 years of age, and I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief and, as to those facts, I am informed and believe them to be true. Some of the information presented below is based upon my review of data regularly compiled by the Debtor in the ordinary course of business. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below.

2. I am the President and Chief Executive Officer of Imperial Capital Bancorp, Inc. (the "Debtor"). Accordingly, I have personal knowledge of the Debtor's position in its industry, its competitors, and its strengths.

3. As CEO for the Debtor, I am responsible for all aspects of the Debtor's business and operations, including strategic and financial planning, acquisitions and divestitures, financing, business operations, and customer, vendor and employee relationships. I am involved on a day-to-day basis with all major decisions made by the Debtor. Accordingly, I have personal knowledge of all major aspects of the Debtor's ongoing business affairs.

4. As CEO, I am directly responsible for all facets of the Debtor's financial affairs, including overseeing the preparation of financial statements and interim financial reports, and identifying and managing acquisitions and divestitures. Accordingly, I have personal knowledge of the material aspects of the Debtor's day-to-day business operations, financial condition, and books and records.

5. Based upon my personal knowledge of the Debtor, its business operations, its history, its industry, and its books and records, and based upon information contained in the Debtor's books and records, I am qualified to give this declaration on behalf of the Debtor.

6. The Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on the date hereof (the "Petition Date").

7.  I submit this declaration in support of the various first-day motions submitted to the Bankruptcy Court concurrently herewith (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, reports prepared for me by other officers and employees of the Debtor, discussions I have had with other officers and employees of the Debtor or my opinion based upon my experience, expertise and knowledge of the Debtor's operations, financial condition and industry. If called upon to testify, I could and would testify competently as to my knowledge regarding the veracity of the facts set forth herein.

A.  **Summary of Business**

8.  The Debtor is a diversified bank holding company headquartered in La Jolla, California. It owns 100% of the common stock of Imperial Capital Bank (the "Bank"), a California state chartered commercial bank that had approximately $4.4 billion in assets and six retail branches located in California (Beverly Hills, Costa Mesa, Encino, Glendale, San Diego, and San Francisco), two retail branches located in Nevada (Carson City and Las Vegas), and one retail branch located in Baltimore, Maryland. On the Petition Date, the Federal Deposit Insurance Corp. (the "FDIC") seized the Bank and placed it into a receivership. The Bank had been in business for thirty-five years.

9.  Prior to the FDIC's seizure, the Debtor and Bank were primarily engaged in (i) originating and purchasing real estate loans secured by income producing properties for retention in their loan portfolio, (ii) originating entertainment finance loans, and (iii) accepting customer deposits through certificates of deposit, money market, passbook, and demand deposit accounts.

10.  In the five years prior to the Petition Date, the Bank engaged in a significant amount of residential and condominium construction lending. The economic events of 2008 and 2009 dramatically impacted the Bank with respect to its origination and purchase of real estate loans, as the Bank's construction borrowers, who rely on the sales of homes to repay the Bank's loans, were not able to find buyers. Some of those construction borrowers defaulted on their Bank loans. The Bank's difficulties resulted in the issuance of a cease and desist (the "Order") by the FDIC and California Department of Financial Institutions (the "FDI") on February 17, 2009. Among other

things, the Cease and Desist Order required the Bank to submit to regulators (i) a detailed capital plan to address how the Bank would remain "adequately capitalized," (ii) a revised policy for determining the allowance for loan losses, (iii) plans for reducing commercial real estate loan capitalizations and brokered deposits, and (iv) a strategic business plan and profitability plan. Over the next eight months, the Debtor complied with the requirements of the Order. However, as of September 30, 2009, the FDIC contended that the Bank's "Tier 1 Leverage Ratio" and "Total Risk-Based Capital Ration" (as such terms are utilized by the FDIC) were below the thresholds established by the FDIC and DFI.

11. As a result, on October 14, 2009, the FDIC issued a "Supervisory Prompt Corrective Action Directive" (the "Directive"), which provided that the Bank was required to sell enough voting shares or obligations of the Bank so that the Bank would be "adequately capitalized" under regulatory capital guidelines, and/or accept an offer to be acquired by a depository institution holding company or combine with another insured depository institution. As of the Petition Date, the Debtor and Bank had been unsuccessful in their efforts to comply with the Directive's requirements. Accordingly, in their Form 10-Q quarterly report dated November 16, 2009, the Debtor disclosed the possibility that the Bank could be seized by the FDIC and DFI.

12. In the November 2009 Form 10-Q, the Debtor reported that the consolidated loss for the Debtor, Bank, and related subsidiaries was $112 million for the nine months ended September 30, 2009. The decline was primarily caused by (i) a $63.1 million increase in provision for loan losses recorded in connection with the increase in non-performing loans and other "loans of concern" and (ii) a $16.8 million increase in provision for income taxes that was recorded to provide for a valuation allowance against the Debtor's remaining net deferred tax assets.

13. On December 29, 2008, trading in the Debtor's shares on the New York Stock Exchange ("NYSE") was suspended due to the Debtor's failure to meet the NYSE's minimum global market capitalization thresholds. As of the Petition Date, the Debtor's shares were currently trading on the Pink Sheets under the symbol "IMPC". The Debtor estimates that there are 76 holders of record of the Debtor's common stock, which represent an estimated 1,268 beneficial shareholders with a total of 5,248,760 shares outstanding.

14. From September 2000 to December 2002, the Debtor created five trusts (the "Trusts") that issued preferred securities. Specifically, the Trusts are ITLA Capital Statutory Trust I ("Trust I"), ITLA Capital Statutory Trust II ("Trust II"), ITLA Capital Statutory Trust III ("Trust III"), ITLA Capital Statutory Trust IV ("Trust IV"), and ITLA Capital Statutory Trust V ("Trust V").

15. Trust I issued $14 million of 10.6% cumulative trust preferred securities in September 2000. Five months later, in February 2001, Trust II issued $15 million of 10.2% cumulative trust preferred securities. In October 2002, Trust III issued $20 million of variable rate cumulative trust preferred securities. Finally, in December 2002, Trust IV issued $10 million of variable rate cumulative trust securities and Trust V issued $25 million of variable rate cumulative trust preferred securities. In February 2009, the Federal Reserve Bank of San Francisco notified the Debtor that it was prohibited from making any dividend payments on account of the securities issued by the Trusts. As of the Petition Date, the total amount of trust preferred securities was approximately $86.6 million.

**FIRST DAY MOTIONS**

16. In connection with the preparation for this bankruptcy proceeding, I became familiar with the proposed "first day" motions[1] that were to be filed concurrently with this Declaration. As set forth more fully below, I believe that the entry of orders granting the relief requested in the "first day" motions is critical to the Debtor's ability to maximize the return to its estate and creditors.

A. **Motion For An Order Pursuant To 11 U.S.C. §§ 102 And 105 And Bankruptcy Rules 2002(m) And 9007 Limiting Notice And Permitting Debtor In Possession To Serve Insured Depository Institutions By First Class Mail**

17. The Debtor is seeking authorization that notice of matters within the scope of various Bankruptcy Rules be limited. The Debtor is also seeking authorization to serve insured depository institutions by first-class mail instead of by certified mail.

18. I believe that it is necessary and appropriate to adopt the proposed procedures for several reasons. Providing notice of all matters to the Debtor's many creditors, potential creditors

---

[1] Terms defined in each of the first day motions are used herein as therein defined.

and other interested parties, and to insured depository institutions by certified mail, could (i) delay substantially the provision of notice in each particular instance, (ii) place an enormous administrative burden on the Debtor's estate, and (iii) unnecessarily increase the costs of these cases.

19. I believe that the use of the procedures proposed here by the Debtor is appropriate in these cases as it will reduce significantly the burden, complication, delay, and cost to the Debtor's estate associated with providing notice of all matters to hundreds of creditors, potential creditors and other interested parties. In light of the fact that the Debtor may need to provide notice on several motions early in this case, it is imperative that the notice procedures suggested by the Debtor be implemented as soon as possible.

**B.    Motion For Order Extending Time To File Schedules And Related Materials**

20. Currently, the Debtor has a limited staff. I believe that requiring the Debtor's limited staff to prepare the Schedules within fourteen (14) days of the Petition Date would unduly detract from other essential activities that the Debtor must perform during the beginning of its bankruptcy case.

21. Indeed, if this Court does not grant the Debtor a thirty (30) day extension, the Debtor's staff would be required to devote substantial time to the task of completing the Schedules, at the exclusion of other pressing and important matters. Additionally, I believe that it is almost certain that the Debtor will not be able to prepare and file the Schedules within fifteen (15) days of the Petition Date.

22. Completion of the Schedules will take significant time because (i) the Debtor has approximately 200 parties in interest and creditors on its creditor matrix, (ii) the Debtor's operations involve numerous contracts, leases, and other agreements, (iii) many of the Debtor's liabilities constitute contingent, unliquidated claims relating to obligations that are difficult to quantify, and (iv) the Debtor and its professionals need time to evaluate the information comprising the Schedules once compiled.

23. The Debtor is currently in the process of assembling the requisite information and I anticipate that the Debtor will be in a position to complete and file the Schedules within forty-four (44) days of the Petition Date.

C. **Motion For Order Pursuant To 11 U.S.C. § 366 (I) Prohibiting Utilities From Altering, Refusing Or Discontinuing Services To, Or Discriminating Against The Debtor; (II) Providing That A Single Deposit For All The Debtors' Utilities Shall Constitute Adequate Assurance Of Future Payment; And (III) Establishing Procedures For Determining Requests For Additional Assurance**

24. In connection with the Debtor's ongoing business operations, the Debtor currently obtains electricity, natural gas, water, telephone, and other similar services (collectively, the "Utility Services") from approximately five companies.

25. If the Utility Services are disrupted, the Debtor will be unable to operate, and the effect would be detrimental to the Debtor's ability to maximize value for its creditors.

26. Attached as Exhibit 1 to the Utility Motion is a list of all, or substantially all, of the Utilities that I believe are currently providing Utility Services to the Debtor.

27. Prior to the Petition Date, the Debtor generally paid all of its utility bills in a regular manner.

28. To the best of my knowledge, there are no defaults or arrearages of any kind with respect to any undisputed utility bills, other than current charges may have accrued but have not yet been billed, or which may have been billed but were not yet due, or amounts whose payment may have been delayed or interrupted by the filing of this chapter 11 case.

29. The Debtor's monthly utility bills average approximately $4,578 in the aggregate.

30. The Debtor has established an escrow account, into which the Debtor will deposit funds equaling one month's average payments to all of the Utilities, which will serve as security for the Utilities during the pendency of this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 18, 2009, at La Jolla, California.

Joseph W. Kiley, III

534302v1

6