GARY E. KLAUSNER (STATE BAR NO. 69077)
GREGORY K. JONES (STATE BAR NO. 181072)
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Telecopy:　(310) 228-5788

[Proposed] Reorganization Counsel for
Debtor and Debtor in Possession

<u>Debtor's Mailing Address:</u>
Post Office Box 2283
La Jolla, CA 92037-2283

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>IMPERIAL CAPITAL BANCORP, INC., a Delaware corporation,<br><br>　　　　　　Debtor.<br><br>Tax Identification Number:<br><br>95-4596322 | Case No. 09-19431-11-LA<br><br>Chapter 11<br><br>**MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 541, 549, AND 507(a)(8) AUTHORIZING THE DEBTOR TO PAY PREPETITION PAYROLL TAXES; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF ANTHONY RUSNAK IN SUPPORT THEREOF**<br><br><u>Hearing</u><br><br>[To be set by the Court if required] |

535127v2

## **TABLE OF CONTENTS**

|   |   |   | Page(s) |
|---|---|---|---|
| I. | STATEMENT OF FACTS | | 3 |
| | A. | The Chapter 11 Case. | 3 |
| | B. | The Debtor's Capital Structure and Business Operations. | 3 |
| | C. | Prepetition Payroll Taxes. | 4 |
| II. | ARGUMENT | | 6 |
| | A. | The Doctrine of Necessity | 6 |
| | B. | Priority | 8 |
| | C. | Trust Fund Status | 8 |
| | D. | Implied Authority | 9 |
| III. | CONCLUSION | | 9 |

# TABLE OF AUTHORITIES

**CASES**

In re American Int'l Airways, Inc.,
    70 B.R. 102 (Bankr. E.D. Pa. 1987) ............................................................8

Begier v. Internal Revenue Serv.,
    496 U.S. 53 (1990) ......................................................................................8

In re Chateaugay Corp.,
    80 B.R. 279 (S.D.N.Y. 1987) ......................................................................6

DeChiaro v. New York State Tax Comm'n,
    760 F.2d 432 (2d Cir. 1985) ........................................................................8

Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.),
    37 B.R. 334 (W.D. Mo.),
    appeal dismissed, 738 F.2d 445 (8th Cir. 1984) ..........................................9

In re Ionosphere Clubs, Inc.,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...........................................................7

In re Ionosphere Clubs, Inc.,
    101 B.R. 844 ................................................................................................6

In re Lehigh & N.E. Ry Co.,
    657 F.2d at 581 ............................................................................................7

Miltenberger v. Logansport Ry. Co.,
    106 U.S. 286 (1882) ....................................................................................6

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984) ....................................................................................7

In re NVR L.P.,
    147 B.R. 126 (Bankr. E.D. Va. 1992) ..........................................................6

PBGC v. Sharon Steel Corp. (In re Sharon Steel Corp.),
    159 B.R. 730 (Bankr. W.D. Pa. 1993) .........................................................6

Rosenow v. Illinois Dept. of Revenue (In re Rosenow),
    715 F.2d 277 (7th Cir. 1983) .......................................................................8

Shank v. Washington State Dep't of Revenue (In re Shank),
    792 F.2d 829 (9th Cir. 1986) .......................................................................8

In re Structurelite Plastics Corp.,
    86 B.R. 922 (Bankr. S.D. Ohio 1988) .........................................................6

In re UNR Indus., Inc.,
   142 B.R. 506 (Bankr. N.D. Ill. 1992)
   rev'd on other grounds, In re UNR Indus., Inc.,
   173 B.R. 149, 158-59 (Bankr. N.D. Ill. 1994) ................................................................ 6, 7

**STATUTES**

11 U.S.C. § 105(a) ............................................................................................................. 1, 5, 6

11 U.S.C. § 507(a) ................................................................................................................. 1, 7

11 U.S.C. § 541 .......................................................................................................................... 1

11 U.S.C. § 541(d) ..................................................................................................................... 8

11 U.S.C. § 549 ...................................................................................................................... 1, 9

11 U.S.C. § 549(a) ..................................................................................................................... 8

11 U.S.C. § 1107(a) ................................................................................................................... 3

11 U.S.C. § 1108 ........................................................................................................................ 3

11 U.S.C. § 1129(a) ................................................................................................................... 7

**OTHER AUTHORITIES**

2 Collier on Bankruptcy, ¶ 105.1, at 105-5 (15th rev. ed. 2001) ........................................... 6

LBR 9013 .................................................................................................................................... 1

**TO THE HONORABLE LOUISE DeCARL ADLER, UNITED STATES BANKRUPTCY JUDGE; AND OTHER INTERESTED PARTIES:**

Imperial Capital Bancorp, Inc., debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), hereby moves (the "Motion") the Court for entry of an order, pursuant to 11 U.S.C. §§ 105(a), 541, 549 and 507(a)(8), authorizing it to pay pre-petition payroll taxes in the amount of $91,309.41 and any related fees, expenses and charges.

Prior to the commencement of the bankruptcy case, the Debtor paid all of its employees their wages through the petition date. Unfortunately, because the Debtor was in the process of transferring money and opening new bank accounts, there were insufficient funds in the account electronically linked to ADP to fund the prepetition payroll taxes due to the Internal Revenue Services and the California taxing authorities (collectively, the "Taxing Authorities"). As a result, although the Debtor paid its employees all of their prepetition wages, the related payroll taxes were not paid.

Good cause exists to grant the Motion because the payroll taxes would be entitled to priority treatment under Bankruptcy Code section 507(a)(8) and would likely be paid in full in this case. In addition, a portion of the prepetition payroll taxes are the employees' portion, which the Debtor deducted from the employees' wages and was holding on their behalf to transmit to the various Taxing Authorities. The employees' portion of the prepetition payroll taxes, therefore, does not constitute property of the estate.

Pursuant to Local Bankruptcy Rule 9013, the Debtor has served this Motion and a separate Notice of Motion conforming to Local Form CSD 1182 on the Office of the United States Trustee, the twenty largest creditors, and the Taxing Authorities by first class mail. Unless an opposition and a request for a hearing is timely filed, the Debtor requests that the Court grant the Motion without a hearing.

This Motion is based on the annexed Memorandum Of Points And Authorities, the accompanying "Declaration Of Anthony Rusnak" (the "Rusnak Declaration"), the record in this case, and the arguments, evidence, and representations that may be presented at or prior to the hearing, if any, on this Motion.

      **WHEREFORE**, the Debtor respectfully requests that the Court enter an order: (i) authorizing the Debtor to pay pre-petition payroll taxes in the amount of $91,309.41 and any related fees, expenses and charges; and (ii) granting such other and further relief as the Court deems to be just and proper.

DATED: January 8, 2010              /s/ *Gregory K. Jones*
                                             GARY E. KLAUSNER, and
                                             GREGORY K. JONES, Members of
                                             STUTMAN, TREISTER & GLATT
                                             PROFESSIONAL CORPORATION
                                             [Proposed] Reorganization Counsel for Debtor and
                                             Debtor in Possession

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.     The Chapter 11 Case.**

On December 18, 2009 (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition under chapter 11 of the Bankruptcy Code. As permitted by Bankruptcy Code sections 1107(a) and 1108, the Debtor is continuing to operate its business as a debtor in possession.

**B.     The Debtor's Capital Structure and Business Operations.**

The Debtor is a diversified bank holding company headquartered in La Jolla, California. It owns 100% of the common stock of Imperial Capital Bank (the "Bank"), a California state chartered commercial bank that had approximately $4.4 billion in assets and six retail branches located in California (Beverly Hills, Costa Mesa, Encino, Glendale, San Diego, and San Francisco), two retail branches located in Nevada (Carson City and Las Vegas), and one retail branch located in Baltimore, Maryland. On the Petition Date, the Federal Deposit Insurance Corp. (the "FDIC") seized the Bank and placed it into a receivership. The Bank had been in business for thirty-five years.

Prior to the FDIC's seizure, the Debtor and Bank were primarily engaged in (i) originating and purchasing real estate loans secured by income producing properties for retention in their loan portfolio, (ii) originating entertainment finance loans, and (iii) accepting customer deposits through certificates of deposit, money market, passbook, and demand deposit accounts.

In the five years prior to the Petition Date, the Bank engaged in a significant amount of residential and condominium construction lending. The economic events of 2008 and 2009 dramatically impacted the Bank with respect to its origination and purchase of real estate loans, as the Bank's construction borrowers, who rely on the sales of homes to repay the Bank's loans, were not able to find buyers. Some of those construction borrowers defaulted on their Bank loans. The Bank's difficulties resulted in the issuance of a Cease and Desist Order by the FDIC and California Department of Financial Institutions (the "FDI") on February 17, 2009. Among other things, the

Cease and Desist Order required the Bank to submit to regulators (i) a detailed capital plan to address how the Bank would remain "adequately capitalized," (ii) a revised policy for determining the allowance for loan losses, (iii) plans for reducing commercial real estate loan capitalizations and brokered deposits, and (iv) a strategic business plan and profitability plan. Over the next eight months, the Debtor complied with the requirements of the Cease and Desist Order. However, as of September 30, 2009, the FDIC contended that the Bank's "Tier 1 Leverage Ratio" and "Total Risk-Based Capital Ration" (as such terms are utilized by the FDIC) were below the thresholds established by the FDIC and DFI.

As a result, on October 14, 2009, the FDIC issued a "Supervisory Prompt Corrective Action Directive" (the "Directive"), which provided that the Bank was required to sell enough voting shares or obligations of the Bank so that the Bank would be "adequately capitalized" under regulatory capital guidelines, and/or accept an offer to be acquired by a depository institution holding company or combine with another insured depository institution. As of the Petition Date, the Debtor and Bank had been unsuccessful in their efforts to comply with the Directive's requirements. Accordingly, in their Form 10-Q quarterly report dated November 16, 2009, the Debtor disclosed the possibility that the Bank could be seized by the FDIC and DFI.

In the November 2009 Form 10-Q, the Debtor reported that the consolidated loss for the Debtor, Bank, and related subsidiaries was $112 million for the nine months ended September 30, 2009. The decline was primarily caused by (i) a $63.1 million increase in provision for loan losses recorded in connection with the increase in non-performing loans and other "loans of concern" and (ii) a $16.8 million increase in provision for income taxes that was recorded to provide for a valuation allowance against the Debtor's remaining net deferred tax assets.

After the seizure of the Bank, the Debtor commenced this chapter 11 case to protect its valuable assets and determine whether it can propose a confirmable reorganization plan by utilizing those assets and potential business opportunities.

C.      **Prepetition Payroll Taxes.**

In the ordinary course of its business, the Debtor collects from its employees certain federal and state taxes (such as FICA and Medicare taxes) that the Debtor withholds from its

employees' paychecks or pay as a result of its employees' wages (e.g., the employer portion of FICA). The Debtor generally holds the payroll taxes for a period of time before remitting them to the Internal Revenue Service and the appropriate California taxing authorities (collectively, the "Taxing Authorities").

Prior to the Petition Date, the Debtor used ADP, an outside payroll processing company, to process its payroll. Once a payroll was processed and approved, ADP was authorized to access and electronically transfer sufficient funds from the Debtor's bank account to fund the payroll and the associated payroll taxes. Before bankruptcy, the Debtor maintained a bank account at the Bank, and ADP was authorized to electronically transfer money out of that account.

The vast majority of the employees were employees of the Bank. There were only 6 employees directly employed and compensated by the Debtor. In anticipation of the seizure of the Bank, the Debtor determined to pay its 6 employees through the Petition Date. The Debtor approved the payroll through the Petition Date and authorized ADP to access and electronically transfer sufficient funds from its bank account to fund the payroll and the related payroll taxes. Unfortunately, at the time the last prepetition payroll was being processed by ADP, the Debtor was also in the process of transferring most of its money out of the account maintained at the Bank and transferring the money to a new account at Bank of America, N.A. ("BofA").

As a result, although there were sufficient funds in the Debtor's account maintained at the Bank for all the payroll wages to clear, there were insufficient funds to pay the prepetition payroll taxes for the fourth quarter of 2009 due in December of 2009 in the amount of $91,309.14. The prepetition payroll taxes include both the employees' portion that the Debtor deducted from the employees' wages and the Debtor's portion, as the employer. The vast majority of the unpaid prepetition taxes are the employees' portion, which were withheld by the Debtor from the employees' paycheck. Of the $91,309.14 in prepetition payroll taxes, $86,064.41 constitute the employees' portion that the Debtor withheld and only $5,244.73 constitute the Debtor's required employer contribution. Attached hereto as Exhibit "1" to the accompanying Rusnak Declaration is a true and correct copy of a Statistical Summary Detail prepared by ADP for the Debtor's payroll due on December 18, 2009, which details the amount of prepetition payroll taxes due and owing by the

Debtor. The Debtor currently maintains sufficient funds in the BofA account to pay the prepetition payroll taxes in full.

## II.

## ARGUMENT

For the following reasons, this Court should enter an order authorizing the Debtor to pay the prepetition payroll taxes to the various taxing authorities.

### A. The Doctrine of Necessity

<u>First</u>, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. 105(a). The purpose of section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 <u>Collier on Bankruptcy</u>, ¶ 105.1, at 105-5 (15th rev. ed. 2001).

Using their equitable powers, bankruptcy courts have repeatedly permitted postpetition payment of prepetition obligations when those payments are necessary to preserve the going concern value of a debtor's business. <u>See, e.g.</u>, <u>Miltenberger v. Logansport Ry. Co.</u>, 106 U.S. 286, 312 (1882) (authorizing payment of pre-receivership claim prior to reorganization to prevent "stoppage of . . . [indispensable] business relations"); <u>In re Ionosphere Clubs, Inc.</u>, 101 B.R. 844, 855 (Bankr. S.D.N.Y. 1989 (payment of prepetition claim is appropriate if it "confers a benefit on the estate and not merely on the payee").

Under this doctrine -- known as the "necessity of payment rule" or the "doctrine of necessity" -- courts often allow immediate payment of certain prepetition obligations even though the Bankruptcy Code may not explicitly authorize such payment. While this doctrine was not codified in the Bankruptcy Code, courts have used their equitable power under section 105(a) of the Bankruptcy Code to authorize the payment of prepetition obligations when such payment is deemed necessary to the survival or successful reorganization of a chapter 11 debtor. <u>See, e.g.</u>, <u>PBGC v. Sharon Steel Corp. (In re Sharon Steel Corp.)</u>, 159 B.R. 730 (Bankr. W.D. Pa. 1993); <u>In re NVR L.P.</u>, 147 B.R. 126 (Bankr. E.D. Va. 1992); <u>In re UNR Indus.</u>, 143 B.R. 506 (Bankr. N.D. Ill. 1992).

The doctrine of necessity is frequently invoked early in reorganization cases, during

the so-called "breathing spell." For example, in <u>In re Structurelite Plastics Corp.</u>, the court embraced "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition [obligations] where such payment is necessary to 'permit the greatest likelihood of survival of the debtor…'" <u>In re Structurelite Plastics Corp.</u>, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) (citing <u>In re Chateaugay Corp.</u>, 80 B.R. 279, 287 (S.D.N.Y. 1987). The court explained that "a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." <u>Id.</u> at 932.

Ample precedent supports applying the doctrine of necessity to permit postpetition satisfaction of prepetition taxes and other "trust fund" obligations. <u>See, e.g.</u>, <u>In re UNR Indus., Inc.</u>, 142 B.R. 506, 519-20 (Bankr. N.D. Ill. 1992) <u>rev'd on other grounds</u>, <u>In re UNR Indus., Inc.</u>, 173 B.R. 149, 158-59 (Bankr. N.D. Ill. 1994); <u>In re Lehigh & N.E. Ry Co.</u>, 657 F.2d at 581; <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989) (citing <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 528 (1984)).

Paying the prepetition payroll taxes is essential to the Debtor's bankruptcy case. The Debtor believes that some of the Taxing Authorities may cause the Debtor to be audited if the pre-petition payroll taxes are not paid promptly. Such audits would divert attention from the reorganization process and increase the costs of administering these estates.

In addition, many Taxing Authorities impose personal liability on the officers and directors of collecting entities, such as the Debtor, for taxes collected by those entities that are not paid to the appropriate taxing authority. Thus, to the extent that the prepetition payroll taxes remain unpaid, the Debtor's officers and directors may be subject to audits and/or lawsuits on account of nonpayment during the pendency of this chapter 11 case. Such proceedings obviously would constitute a significant distraction for these officers and directors at a time when they should be focused on the Debtor's efforts to develop and implement a successful reorganization strategy. This problem could be compounded if the affected individuals assert rights of indemnity against the Debtor for any costs incurred in defending against or otherwise responding to claims which the Taxing Authorities might assert against them on account of the Debtor's nonpayment of prepetition payroll taxes.

**B.     Priority**

Second, Bankruptcy Code sections 507(a)(8)(C) and 507(a)(8)(D) give priority status to the Taxing Authorities' claims for withholding taxes or employment taxes on employee wages or salary. To the extent they are priority claims, the prepetition obligations to the Taxing Authorities must ultimately be paid in full (either immediately or over time) under any chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(C). Thus, the payment of prepetition payroll taxes at this time would not prejudice the rights of other creditors, but would merely accelerate payments that would otherwise become due as part of the Debtor's chapter 11 plan process. At the same time, such payment would avoid the significant problems and issues, described above, that could arise if the unpaid taxes were not paid at this time.

**C.     Trust Fund Status**

Third, to the extent that the Debtor has collected prepetition payroll taxes from the employees that must be remitted to the pertinent Taxing Authorities, such funds may be viewed as being held in trust by the Debtor for the benefit of the employees and the Taxing Authorities, and not as constituting property of the Debtors' estates. In this case, substantially all of the prepetition payroll taxes at issue ($86,064.41 out of $91,309.14) are the employees' portion of the taxes that the Debtor withheld and must transmit to the Taxing Authorities. Bankruptcy Code section 541(d) provides, in relevant part, as follows:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). Because the taxes may be considered so-called "trust fund" amounts, these funds may be viewed as being held in trust for the taxing authorities. See, e.g., Begier v. Internal Revenue Serv., 496 U.S. 53 (1990); Rosenow v. Illinois Dept. of Revenue (In re Rosenow), 715 F.2d 277, 282 (7th Cir. 1983) (sales tax required by state law to be collected by sellers from their customers is "trust fund" tax); Shank v. Washington State Dep't of Revenue (In re Shank), 792 F.2d 829, 830 (9th Cir. 1986) (sales tax required by state law to be collected by sellers from their

customers is a "trust fund" tax); <u>DeChiaro v. New York State Tax Comm'n</u>, 760 F.2d 432, 433-34 (2d Cir. 1985) (same); <u>In re American Int'l Airways, Inc.</u>, 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (excise and withholding taxes). Thus, the Debtor may not have any equitable interest in such amounts and should be permitted to pay the prepetition payroll taxes to the Taxing Authorities to which they are owed as they become due.

### D. Implied Authority

Fourth, Section 549(a)(2)(B), which governs most postpetition transfers, provides in part that "the trustee may avoid a transfer of property of the estate (1) made after the commencement of the case and, . . . that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(2)(B) (emphasis added). It follows that the Court may authorize certain postpetition payments to satisfy prepetition debts, including the Taxes. The statute grants the Court, faced with the intricate facts and circumstances of each case, the discretion to ascertain whether a debtor's business judgment to make a postpetition transfer inures to the benefit of the estate in the particular case, and, if so, to authorize the transfer. See <u>Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.)</u>, 37 B.R. 334, 336 n.3 (W.D. Mo.), <u>appeal dismissed</u>, 738 F.2d 445 (8th Cir. 1984) ("It would appear proposed transfers could be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack under section 549 . . . "). As demonstrated above, the payment of prepetition payroll taxes is vital to the Debtors' bankruptcy case for many reasons.

## III.

## CONCLUSION

For the reasons, and based on the arguments and authorities set forth above, the Debtor respectfully requests that the Court enter an order: (i) authorizing the Debtor to pay prepetition payroll taxes in the amount of $91,309.41 and any related fees, expenses and charges; and (ii) granting such other and further relief as the Court deems to be just and proper.

DATED: January 8, 2010

/s/ *Gregory K. Jones*
GREGORY K. JONES, a Member of
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
[Proposed] Reorganization Counsel for Debtor and
Debtor in Possession

535127v2

9

**DECLARATION OF ANTHONY RUSNAK**

I, Anthony Rusnak, declare as follows:

1. I am over 18 years of age, and I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief and, as to those facts, I am informed and believe them to be true. Some of the information presented below is based upon my review of data regularly compiled by the Debtor in the ordinary course of business. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below.

2. I am the General Counsel and Chief Operating Officer ("COO") of Imperial Capital Bancorp, Inc. (the "Debtor").

3. As the General Counsel and COO for the Debtor, I am primarily responsible for managing the day-to-day activities of the Debtor and administering the bankruptcy estate. Accordingly, I have personal knowledge of all major aspects of the Debtor's ongoing business affairs.

4. Based upon my personal knowledge of the Debtor, its business operations, its history, its industry, and its books and records, and based upon information contained in the Debtor's books and records, I am qualified to give this declaration on behalf of the Debtor.

5. On December 18, 2009 (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.

6. In the ordinary course of its business, the Debtor collects from its employees certain federal and state taxes (such as FICA and Medicare taxes) that the Debtor withholds from its employees' paychecks or pay as a result of its employees' wages (e.g., the employer portion of FICA). The Debtor generally holds the payroll taxes for a period of time before remitting them to the Internal Revenue Service and the appropriate California taxing authorities (collectively, the "Taxing Authorities").

7. Prior to the Petition Date, the Debtor used ADP, an outside payroll processing company, to process its payroll. Once a payroll was processed and approved, ADP was authorized to access and electronically transfer sufficient funds from the Debtor's bank account to fund the

payroll and the associated payroll taxes. Before bankruptcy, the Debtor maintained a bank account at the Bank, and ADP was authorized to electronically transfer money out of that account to fund payroll and payroll taxes.

8. The vast majority of the employees were employees of the Bank. There were only 6 employees, including myself, directly employed and compensated by the Debtor. In anticipation of the seizure of the Bank, the Debtor determined to pay its 6 employees through the Petition Date. The Debtor approved the payroll through the Petition Date and authorized ADP to access and electronically transfer sufficient funds from its bank account to fund the payroll and the related payroll taxes. Unfortunately, at the time the last prepetition payroll was being processed by ADP, the Debtor was also in the process of transferring most of its money out of the account maintained at the Bank and transferring the money to a new account at Bank of America, N.A. ("BofA").

9. As a result, although there were sufficient funds in the Debtor's account maintained at the Bank for all the payroll wages to clear, there were insufficient funds to pay the prepetition payroll taxes for the fourth quarter of 2009 due in December of 2009 in the amount of $91,309.14.

10. The prepetition payroll taxes include both the employees' portion that the Debtor deducted from the employees' wages and the Debtor's portion, as the employer. The vast majority of the unpaid prepetition taxes are the employees' portion, which were withheld by the Debtor from the employees' paycheck. Of the $91,309.14 in prepetition payroll taxes, $86,064.41 constitute the employees' portion that the Debtor withheld and only $5,244.73 constitute the Debtor's required employer contribution.

11. Attached hereto as Exhibit "1" is a true and correct copy of a Statistical Summary Detail prepared by ADP for the Debtor's payroll due on December 18, 2009, which details the amount of prepetition payroll taxes due and owing by the Debtor.

12. The Debtor currently maintains sufficient funds in the BofA account to pay the prepetition payroll taxes in full.

11

1 | I declare under penalty of perjury under the laws of the United States of America that
2 | the foregoing is true and correct.
3 | Executed on January 8, 2010, at La Jolla, California.

_____
ANTHONY RUSNAK

# Statistical Summary Detail

**ADP**

| | | | | |
|---|---|---|---|---|
| **Net Pay** | | | | |
| Checks | | | | .00 |
| Direct Deposits | | | | .00 |
| Subtotal Net Pay | | | | 182,226.17 |
| Adjustments | | | | .00 |
| **Total Net Pay Liability (Net Cash)** | | | | **182,226.17** |

| | | You are responsible for Depositing these amounts | | Amount debited from your account | |
|---|---|---|---|---|---|
| **Taxes** | | | | | |
| Agency | Rate | EE withheld | ER contrib. | EE withheld | ER contrib. |
| **Federal** | | | | | |
| Federal Income Tax | | | | 58,855.26 | |
| Earned Income Credit Advances | | | | | |
| Social Security | | | | 1,280.02 | 1,280.02 |
| Medicare | | | | 3,956.97 | 3,956.95 |
| Federal Unemployment Tax | | | | | 1.32 |
| Subtotal Federal | | | | 64,092.25 | 5,238.29 |
| Cobra Premium Assistance Payments | | | | | |
| **Total Federal** | | | | 64,092.25 | 5,238.29 | 69,330.54 |
| **State** | | | | | |
| CA State Income Tax | | | | 21,853.46 | |
| CA State Unemployment/Disability Ins-ER | 3.9000 | | | | 118.70 |
| CA State Disability Insurance-EE | | | | | 6.44 |
| Subtotal CA | | | | 21,972.16 | 6.44 | 21,978.60 |
| **Total Taxes** | | | | 86,064.41 | 5,244.73 | 91,309.14 |
| Amount ADP Debited From Account XXXXX0274 | | Tran/ABA .00 | XXXXXXXX .00 | | 91,309.14 |

*/ Excludes Taxes That Are Your Responsibility

| | | | | |
|---|---|---|---|---|
| **Other** | | | | |
| Pay by Pay Insurance | workc. comp. | | | 517.41 |
| **Transfers** | | | | |
| Amount ADP Debited From Account XXXXX0274 | | Tran/ABA | XXXXXXXX | 517.41 |
| **Total Amount ADP Debited From Your Accounts** | | | | **91,826.55** |

Company Code: **1PG**
Company Name: **IMPERIAL CAPITAL**
Region Name: LAPALMA REGION

Batch : **1993**
Quarter Number: **4**
Service Center: **070**

Period Ending : **12/18/2009**
Pay Date : **12/23/2009**
Current Date : **12/22/2009**

Week **52**
Page 2

13   EXHIBIT  1   WSS